IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| BSPV-PLANO, LLC, | § | Case No. 22-40276 |
| | § | (Chapter 11) |
| Debtor. | § | |
| | § | |
| _____ | § | |
| | § | |
| CJ PROJECT MANAGEMENT, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. Proc. No. 22-4055 |
| | § | |
| BSPV-PLANO, LLC, RICHARD SHAW, | § | |
| and NORTH/SOUTH BUILDING, LLC, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

This adversary proceeding arises out of a subcontract between CJ Project Management, Inc. ("**CJ**") and North/South Building, LLC ("**North/South**") to frame buildings on property owned by BSPV-Plano, LLC ("**BSPV**" and, together with North/South, the "**Defendants**'"). CJ initiated this proceeding to resolve the validity and priority of its mechanic's lien against BSPV's property, among other things. North/South filed counterclaims against CJ for breach of contract as well as a claim for damages arising from a fraudulent or invalid lien. BSPV and North/South also asserted counterclaims against CJ for damages arising from a fraudulent or invalid lien. The Court, having considered the evidence and arguments presented at a bench trial on October 29-31, 2024, as well as the record of this proceeding and applicable law, makes the following findings of fact and conclusions of law.

**I JURISDICTION**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a). This Court has authority to enter final orders in this proceeding because it statutorily constitutes a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(B) and (K) and meets all constitutional standards for the proper exercise of full judicial power by this Court. All parties agree to the entry of a final order by this Court.

**II. RELEVANT PROCEDURAL HISTORY**

In its complaint, CJ asserted claims for (1) "misapplication of trust funds," against Richard Shaw, North/South, and BSPV, (2) "statutory retainage and trapped funds" against BSPV and (3) a declaratory judgment that CJ properly perfected mechanic's liens on BSPV's property. The Defendants moved for summary judgment on all of CJ's claims. In its response to the Defendants' motion for summary judgment, CJ expressly abandoned its claim against Richard Shaw for the misapplication of trust funds. In addition, CJ waived its claim against BSPV for "statutory retainage and trapped funds" by failing to address that claim in response to the Defendants' motion for summary judgment. *See Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) (noting that "an issue raised in the complaint but ignored at summary judgment may be deemed waived").

On October 29, 2024, the Court entered an order granting the Defendants' motion for summary judgment, in part. The Court also entered a motion by the Defendants to sanction CJ for the spoilation of evidence on the same date. As a result of the spoilation, the Court presumes that CJ had in its possession, before providing any bid proposals to North/South, sufficient drawing plans and records to show that CJ was bidding to frame 390,000 gross square feet of buildings.

The parties entered into a Joint Pretrial Order but most of the facts surrounding CJ's mechanic's lien remained disputed. The Court proceeded to trial on (1) CJ's request for a declaratory judgment that CJ's claim should be treated as a secured claim in BSPV's bankruptcy case; (2) North/South's counterclaim against CJ for breach of contract; and (3) the counterclaims asserted by BSPV and North/South against CJ for filing a fraudulent or invalid mechanic's lien. The parties submitted written closing arguments. After receiving the closing arguments, the Court took the matter under advisement in order to prepare this detailed written ruling.

### III. FINDINGS OF FACT

#### A.    The Bridgemoor Project

1.    BSPV was formed in May 2018 to acquire, own, develop, and operate a 31.5 acre, "55+" Independent Senior Luxury Apartment Community with 318 units of apartment inventory, that is known and branded as "The Bridgemoor at Plano," and located at 1109 Park Vista Road in Plano, Texas (the "**Project**").

2.    The majority of costs for development and construction of the Project were to be financed through the issuance of private bonds. The Huntington National Bank ("**Huntington**") served as the trustee for the bond holders.

3.    North/South was the prime contractor to BSPV, performing work under a written prime contract with BSPV. Richard Shaw owns North/South, and Roger Zais was the project manager for the Project.

4.    The normal course of funding construction expenses involved North/South compiling receipts, invoices, and applications for payment from subcontractors and submitting these to BSPV for payment. BSPV would then submit the documents to Huntington for review.

Upon approval, Huntington would fund BSPV, and BSPV would transfer funds to North/South. North/South, in turn, would pay construction costs.

### B.    The Framing Subcontract

5.    Ike Chukwura is the principal, owner, and sole employee of CJ. Mr. Chukwura has a master's degree in architecture from a Texas university, and he testified that he has managed and designed construction projects for 20 years.

6.    Mr. Chukwura heard from a friend who was a painting subcontractor on the Project that there was an opportunity to apply to subcontract for the framing work. Although Mr. Chukwura had no experience with framing, and no employees, tools or equipment to perform framing work, he met with Mr. Shaw and Mr. Zais to discuss submitting a bid for the framing for the Project.

7.    North/South had been in the construction business for many years. North/South generally worked with the same subcontractors on its projects.

8.    Mr. Chukwura intended to sub-subcontract the framing work to ReyTex Framing Corp. ("**ReyTex**"). Mr. Shaw was aware of ReyTex but had never hired ReyTex for a project.

9.    CJ had access to all the architectural drawings before submission of its bid to North/South. The architectural drawings contained the square footage and the total number of buildings from which CJ could observe that the scope of framing involved 417,000 square feet of buildings. The framing would involve several different types of apartment buildings, balconies on the apartment buildings, garages, and a club house, among other things.

10.   Page A-2 of the architectural drawings showed the air-conditioned square footage of the apartment buildings, which was 330,073 square feet. Although the air-conditioned square footage was not relevant for framing, it was relevant for other construction purposes.

11.   The framing square footage for the Project was not changed, nor were there any material changes in the drawings, plans, or designs which impacted the square footage to be framed.

12.   CJ provided portions of the architectural drawings to ReyTex. ReyTex used those drawings to formulate a bid for the framing work. ReyTex reviewed the documents it received from CJ and concluded the framing would involve 390,000 square feet. ReyTex underestimated the square footage to be framed for the Project because it inadvertently omitted two buildings from its calculation.

13.   ReyTex submitted a framing bid to CJ dated October 26, 2018. ReyTex proposed that it would frame the Project for CJ for $1,462,500.

14.   On the same day CJ received ReyTex's bid, CJ submitted a framing bid to North/South. CJ proposed that it would frame the project for $1,551,353. CJ's bid was expressly calculated using 330,073 square feet at $4.70 per square foot. CJ's bid to North/South stated that the "siding, fascia and sofit are separate, but can be included at $1.80 per square foot."

15.   Although ReyTex had proposed framing 390,000 square feet for CJ, CJ reduced the square footage to be framed in its bid to North/South to 330,073 based on Mr. Chukwura's reliance on page A-2 of the drawings, which showed the air-conditioned square footage of the occupied units. CJ also increased the total price for the framing work, despite using less square footage in its bid to North/South.

16.      North/South rejected CJ's bid because it was seeking a framing subcontract that was a fixed price subcontract for all the framing and siding work. North/South was not seeking a "cost per square foot" subcontract for framing and siding.

17.      On October 30, 2018, CJ submitted a second bid to North/South proposing that it would frame the project for $2,145,474. The bid amount stated that it included $1,551,343 for framing (at $4.70 per square foot) and $594,131 for siding (at $1.80 per square foot).

18.      CJ learned that North/South had received lower bids. Accordingly, CJ submitted a third bid to North/South on November 1, 2018. CJ's third bid lowered its price. CJ's third bid also removed the language about costs per square foot that North/South had previously rejected. Instead, CJ's third bid stated that CJ would provide "[f]raming of the buildings as shown on the drawings" for the "Total Proposed Amount" of $2,050,000.

19.      CJ's third bid listed the "Total Building Square Footage" as 330,073. Mr. Shaw testified that although there was no reason for CJ to include the amount of air-conditioned square footage for the Project (330,073) in the framing bid, it was a familiar number and "didn't scare him." Mr. Shaw testified, credibly, that CJ's bid was similar in price to other bids North/South had received to frame 417,000 square feet for the Project.

20.      North/South accepted CJ's third bid. Pursuant to a written subcontract dated November 12, 2018, CJ was engaged as a labor subcontractor to North/South to act as the Project's framer. Article 8 described the work CJ would perform as follows: "Complete framing of all buildings as shown on plans. Includes maintenance, clubhouse, and all garages. General contractor to provide all material."

21.      Pursuant to that framing subcontract, CJ committed to install all wood framing and siding for all buildings for the Project in exchange for payment of a fixed price of $2,050,000.

22.    Article 9, Section 9.1 of the subcontract stated that the date of commencement of CJ's

work would be "[a] date set forth in a notice to proceed issued by the Contractor."

23.    Article 9, Section 9.2.2 of the subcontract stated that CJ "shall achieve substantial

completion" of the framing work "[n]ot later than one hundred eighty (180) calendar days

from the date of commencement" of its work.

24.    Article 5, Section 5.3 of the subcontract provides that "[CJ] shall make all Claims

promptly to the Contractor for additional cost, extensions of time and damages for delays,

or other causes in accordance with the Subcontract Documents." "Notice of Claims shall

be provided in writing," per Section 14.4.4 of the subcontract.

25.    CJ never submitted a Notice of Claim for any alleged delay.

26.    In Article 6, Section 6.4 of the subcontract, CJ and North/South agreed to "waive claims

against each other for consequential damages arising out of or relating to this

Subcontract…."

## C.  CJ's Sub-Subcontract with ReyTex

27.    After CJ signed the framing subcontract with North/South, CJ and ReyTex turned to

formalizing a sub-subcontract for the framing labor. In December 2018, ReyTex

attempted to explain to CJ how it had calculated 390,000 square feet for framing based on

the information provided by CJ.

28.    On February 5, 2019, CJ entered into a sub-subcontract with ReyTex to frame the Project

for $1.7 million. The sub-subcontract contained no qualifications of the framing work

that ReyTex committed to perform for $1.7 million.

### D.  Construction Begins

29.    In early 2019, North/South began "dirt work" for the Project – clearing the land, grading it, bringing in fill, etc.

30.    Mr. Shaw testified that rain and wet soil delayed the early "dirt work."

31.    From May through July 2019, ReyTex performed chalking for plumbing prior to pouring the foundations for each building. Mr. Shaw testified that ReyTex billed North/South and North/South paid ReyTex directly.

32.    Work began in preparation for framing in late August or early September 2019, including chalking the foundations for wall placement. CJ's first payment application to North/South was dated September 24, 2019.

33.    Mr. Chukwura emailed Mr. Zais, the project manager for the Project, on September 23, 2019, about the first pay application he intended to submit. Mr. Chukwura told Mr. Zais that he had "made adjustments to accommodate the additional 87,501 square foot of building that was not contained on the bid documents." The "adjustment" Mr. Chukwura attempted to make in the draft pay application was to unilaterally include a "change order" for $580,170, increasing the total subcontract price by that amount due to the "additional" square footage to be framed.

34.    However, the first pay application approved by North/South did not include the referenced "change order." Since the plans for framing the Project had not changed, and North/South had not requested nor approved a change order, North/South struck out the "change order" references before submitting the pay application CJ had prepared to Huntington for review.

35.    Mr. Chukwura communicated via text, email, and phone with Mr. Shaw and Mr. Zais. He
did not have an office on the jobsite but sometimes visited the jobsite.[1] Mr. Chukwura did
not supervise the framing as he had no expertise in framing.

36.    ReyTex's laborers turned to North/South with questions about how to read the plans for
framing. When the laborers sometimes complained that ReyTex had not paid them on
time or in full, Mr. Shaw testified that North/South would advance the laborers funds
against the balance due on the framing subcontract between North/South and CJ.

37.    CJ continued to include references to a "change order" in the pay applications it
submitted to North/South after September 2019. North/South continued to strike those
references before approving CJ's pay applications and sending them to Huntington for
review.

38.    On March 11, 2020, Mr. Chukwura emailed Mr. Zais and stated, "I am not certain why
our change orders are still pending." He further stated, "I have added clarifications to
assist your team in finalizing the decision to execute the changes."

39.    For several months, ReyTex used forklifts and other equipment that North/South had on
the jobsite. Mr. Zais and Mr. Shaw complained that CJ should have its own equipment to
use for the framing work and, eventually, CJ rented equipment.

40.    During the summer of 2020, CJ spent $21,838 for equipment rental and minor,
miscellaneous charges for supplies.

41.    By July 31, 2020, CJ was reporting to North/South that its framing labor was 74%
complete. However, CJ had been systemically overbilling by inflating the percentage of
framing ReyTex had completed so that it could draw down more of the amount due under
the framing subcontract. The invoice from ReyTex to CJ for work through July 23, 2020,

---

[1] In his testimony, Mr. Chukwura referred to his minivan as his mobile office.

when compared to CJ's pay application to North/South for the same period, shows that CJ inflated the percentage completions for nearly every building, sometimes by more than double.

42.    In an email to ReyTex on July 10, 2020, Mr. Chukwura stated, "We are overbilled in many areas, but I believe we will catch up."

43.    On August 26, 2020, Mr. Chukwura sent an email to Mr. Zais stating, "You have been silent concerning our last invoice and outstanding change orders." He asked Mr. Zais to "let [him] know the status of our previous conversation regarding how to pay my workers and carry other expenses till we resolve these pending change orders." Mr. Zais responded via email that day, stating that he had "spoken to Roger [Shaw] and ou[r] position has not changed."

44.    Mr. Chukwura represented to Mr. Zais that CJ could not complete the framing subcontract unless North/South approved his proposed "change orders" and agreed to pay CJ at least an additional $461,543.25. He calculated this figure by subtracting the air-conditioned square footage of the Project from the framing square footage, resulting in 87,913 square feet, and then charging $3.75 per square foot for framing and $1.50 per square foot for siding.

45.    Mr. Chukwura unequivocally refused to provide labor to complete the framing for the Project unless North/South agreed to increase the amount of North/South's framing subcontract with CJ by agreeing to what Mr. Chukwura called a "change order."

46.    After August 26, 2020, ReyTex began working directly for North/South.

47.    Mr. Chukwura continued to contact Mr. Shaw and Mr. Zais requesting payment. Mr. Chukwura was forcibly removed from the Project after a confrontation at the jobsite in September 2020.

48.    On October 12, 2020, CJ emailed Mr. Zais a "final invoice" for "work up to September 14, 2020" (the day Mr. Chukwura was forcibly removed from the jobsite) and he included "[c]hange order number 4 to cover additional general conditions."

49.    However, CJ performed no work on the Project after August 26, 2020. CJ presented no evidence that it offered to continue framing the Project, or attempted to continue framing the Project, after August 26, 2020.

50.    The credible evidence reflects that CJ (through ReyTex) had not completed more than 74% of the total framing required for the Project as of August 31, 2020. North/South had paid CJ $1,398,885 of its $2,050,000 subcontract at the time of termination.

51.    CJ had paid ReyTex $997,038 at the time of termination. In correspondence with ReyTex, CJ took the position that it did not owe ReyTex any further amounts.

52.    North/South incurred the following amounts to complete the framing for the Project after August 26, 2020: (a) subcontract labor $938,571.00; and (b) equipment supply $65,000.00. The total amount incurred by North/South after August 26, 2020, to complete framing for the Project was $1,003,571.

### E.  CJ's Pay Applications

53.    CJ submitted six applications for payment to North/South for the period of September 2019 to May 31, 2020.

54.    These six applications for payment were paid in the aggregate amount of $1,398,885.

55.    After CJ stopped providing framing labor for the Project on August 26, 2020, North/South prepared and presented an application for payment number seven to BSPV for framing work performed through July 31, 2020.

56.    The parties were already in a dispute about CJ's performance when funding was received by BSPV (from the construction lender) and North/South (from BSPV) that applied to application number seven.

57.    North/South used the funding it received as a result of application number seven ($340,622.10) to pay Reytex to perform work within the scope of CJ's framing subcontract.

58.    North/South prepared two additional payment applications for framing work. One application was for progress as of September 30, 2020 (for $102,031.20), and the second application was for progress as of November 2, 2020 (for $205,000), thereby drawing the remaining balance of the original subcontract sum.

59.    North/South used the funds received and allocable to these two remaining applications to pay Reytex and to account for the rental costs for lift equipment used by CJ.

60.    North/South paid an additional $502,756.00 to complete the framing scope of work.

### F.  CJ's Lien Affidavits

61.    CJ filed a lien affidavit in the Texas real property records on September 15, 2020 in the amount of $646,942.30 ("**Lien/Affidavit #1**"). Under the penalty of perjury, Ike Chukwura testified that there had been change orders to the subcontract which increased the subcontract price in the amount of $720,017.86, making the total subcontract price $2,770,017.86. As support, he attached an Application and Certification for Payment No. 7 for the period ending August 31, 2020. The Application and Certification for Payment

No. 7 attached to Lien/Affidavit #1 was not the same as the one prepared by North/South and was not signed by North/South. CJ attached a continuation sheet to its unsigned version of the Application and Certification for Payment No. 7 that explained the new subcontract price based on a charge of $6.53 per square foot for each building.

62.    CJ filed a second lien affidavit in the Texas real property records on October 14, 2020 ("**Lien/Affidavit #2**"), in the amount of $635,576.85. Under the penalty of perjury, Ike Chukwura testified that there had been change orders to the subcontract which increased the Subcontract price in the amount of $1,254,435.36, making the subcontract price $3,304,435.36. In support of Lien/Affidavit #2, CJ attached an Application and Certification No. 9 for the period ending October 14, 2020, which was not signed by North/South. CJ attached a modified continuation sheet to the Application and Certification for Payment No. 9 that included a claim for "extended general conditions" (*i.e.*, damages CJ incurred as a result of construction delay) in the amount of $520,940.

63.    On August 10, 2021, CJ submitted a demand for arbitration against North/South pursuant to the subcontract.

64.    In addition, on August 10, 2021, CJ filed a lawsuit in the 417th Judicial District Court of Collin County, Texas, against BSPV and Richard Shaw.[2]

### G.  BSPV's Bankruptcy Case

65.    BSPV filed for bankruptcy on March 1, 2022. The Project was still under construction on the bankruptcy petition date. CJ's arbitration and litigation also remained pending.

66.    BSPV's bankruptcy schedules described CJ as a creditor with a claim secured by a mechanic's lien that it disputed.

---

[2] CJ did not attach the state court lawsuit to its bankruptcy claim or introduce a copy of the state court lawsuit into evidence at trial.

67.    CJ filed a proof of claim for $1,282,519.15 in BSPV's bankruptcy case, which the Court

assigned Claim #10. CJ asserted that its claim was secured by the two mechanic's liens it

had filed on the Project prior to BSPV's bankruptcy.

68.    On October 5, 2022, CJ filed this adversary proceeding seeking a declaratory judgment

that its claim should be allowed as a secured claim against the bankruptcy estate. CJ also

filed affirmative claims against Mr. Shaw and North/South. North/South filed

counterclaims against CJ for breach of contract and false liens, and BSPV filed a

counterclaim against CJ for a false lien.

69.    Huntington intervened in this adversary proceeding and filed a counterclaim against CJ.

Huntington obtained an agreed declaratory judgment that its lien and security interest in

all of BSPV's assets is superior to the liens alleged by CJ for all purposes.

70.    On August 30, 2023, BSPV confirmed a plan of reorganization. The confirmed plan

provided that CJ had the choice to accept a $200,000 payment within 90 days of the

effective date of the plan or litigate for the full amount that CJ claims it is owed. CJ chose

to litigate.

71.    The parties have agreed that a formal objection to the proof of claim CJ filed in BSPV's

bankruptcy case is not necessary since this adversary proceeding will resolve the validity

of that claim.

### H.  The Amount of CJ's Claim Against BSPV

72.    The amount CJ claims it is owed in this adversary proceeding ($838,805.73) is less than

the amount set forth in its proof of claim ($1,282,519.15). This difference is due, in part,

to CJ's waiver or abandonment of its claims relating to contractual retainage at the

summary judgment stage.

73.     CJ presented an expert witness, John Holstead, in support of a secured claim in BSPV's bankruptcy case in the total amount of $838,805.73. CJ's claim includes alleged delay damages ($231,363.51), the remaining balance CJ alleges is due under the framing subcontract ($407,838.82), and a charge for the alleged additional framing ($199,613.40) completed by CJ.

74.     In his calculations, Mr. Holstead assumed that CJ commenced work under the subcontract in May 2019 when North/South paid ReyTex to chalk lines for the plumbing layout prior to pouring foundations.

75.     The bulk of the "delay damages" claimed by CJ is a full-time salary Mr. Holstead calculated for Mr. Chukwura. Mr. Chukwura is CJ's only employee. CJ did not present any evidence of any salary earned by Mr. Chukwura from CJ prior to signing the subcontract with North/South. CJ also did not present any evidence that Mr. Chukwura worked full-time on the framing for the Project.

76.     Instead, Mr. Holstead used CJ's expected profit from the Project to calculate a salary for Mr. Chukwura of $749.13 per day. Mr. Holstead presumed that Mr. Chukwura spent 100% of every business day from November 2019 to September 15, 2020, working on framing for the Project. Mr. Holstead also included "general conditions" as part of the "delay damages" for Mr. Chukwura's home office at a daily rate of $13.87 per day.

77.     To obtain the damages for the alleged additional framing, Mr. Holstead assumed that CJ had subcontracted to frame 330,073 square feet but that the Project was later changed to require 417,000 square feet of framing. He reviewed the August 31, 2020, payment application prepared by North/South for the project lender which indicated that 86.67% of the budgeted amount for "Carpentry/Lumber/Trusses/Siding" had been billed out. He

then calculated that CJ had performed 86.67% of 417,000 square feet or 363,231 square feet. He then concluded that CJ had completed 32,140 more square feet than agreed upon in its subcontract.

78.    When calculating CJ's damages for alleged additional framing, Mr. Holstead was unaware of the fact that the line item relating to "Carpentry/Lumber/Trusses/Siding" contained $4 million in lumber *materials* and $2 million in *labor*. Mr. Holstead mistakenly assumed that the application meant that 86.67% of total *labor* had been completed (as opposed to the fact that all lumber and decking materials had been purchased for the project and approximately 70% of labor had been invoiced).

79.    Mr. Holstead's analysis also assumed that CJ (and ReyTex) had submitted accurate accounts of the completed framing to North/South and Huntington.

80.    North/South and BSPV presented their own expert witness, Tanner Courrier, who testified that Mr. Holstead's methodology for calculating "delay damages" was not typical for the construction industry. He testified that delay in completing a project, by itself, does not necessarily mean there were "delay damages."

81.    Mr. Courrier testified that, typically, the party claiming "delay damages" must establish that there was a construction delay and that the claiming party was actually damaged by the delay in terms of having an extended site presence. Mr. Courrier testified that charges typically claimed as "delay damages" include payroll costs and equipment costs for an onsite presence that increased due to the passage of time. Mr. Courrier further testified that, typically, the resources included in a claim of "delay damages" must be dedicated full-time to the project.

## I.   North/South's Claim for CJ's Breach of the Framing Subcontract

82.    North/South seeks to recover its completion cost damages owing to CJ's alleged repudiation and breach of the framing subcontract.

83.    North/South's expert, Tanner Courrier, testified that North/South incurred an excess cost, over and above the $2,050,000 subcontract sum to complete the framing work. Based on his analysis of facts, market costs, and the original pricing for the work, Mr. Courrier concluded that this overrun, $352,456, represented reasonable and necessary costs to complete the scope of CJ's framing work.

## IV. DISCUSSION

The Bankruptcy Code does not explicitly refer to "mechanic's liens." The Code defines a "security interest" as including all consensual liens created by agreement. 11 U.S.C. § 101(51). In addition, there are two types of non-consensual liens – judicial liens (11 U.S.C. § 101(36)) and statutory liens (11 U.S.C. § 101(53)).

The Texas Property Code provides that a statutory lien may be imposed on property for the benefit of contractors and suppliers who provide materials and labor for the construction of a building – even if the contractors and suppliers did not contract directly with the property owner. TEX. PROP. CODE § 53.021(1). In order to perfect the lien, "the person claiming the lien must file an affidavit with the county clerk in which the property is located ... no later than the 15th day of the fourth calendar month after the day on which the indebtedness accrues." § 53.052(a). To enforce a mechanic's lien, the lienholder must file a lawsuit and obtain a judgment from a court of competent jurisdiction foreclosing its statutory lien. TEX. PROP. CODE Ann. § 53.158. Pursuant to the statutory scheme, the trial court determines whether the debt is valid and the lien is perfected. *CVN Grp., Inc. v. Delgado,* 95 S.W.3d 234, 241 (Tex. 2002).

The filing of a bankruptcy petition by the owner of the land that is subject to a mechanic's lien triggers the application of § 362 of the Bankruptcy Code. Section 362(a) creates an automatic stay of various actions affecting the bankruptcy debtor, including "any act to create, perfect, or enforce any lien against property of the estate." *See* 11 U.S.C. § 362(a)(4). Actions seeking to enforce a mechanic's lien under applicable state law are stayed. *See, e.g., In re Nash Phillips/Copus, Inc.*, 78 B.R. 798, 802 (Bankr. W.D. Tex. 1987) (holding that a court action seeking to foreclose a mechanic's lien under Colorado law violated the automatic stay). Thus, the dispute in bankruptcy is the priority of a mechanic's lien, that is, whether a mechanic's lien claimed by a creditor was properly perfected prior to bankruptcy (or shortly thereafter as permitted by § 546(b) of the Bankruptcy Code) and the validity of the debt underlying the lien, that is, what amount should be allowed as a secured claim against the bankruptcy estate. *See, e.g., In re Rotary Drilling Tools USA, LLC*, No. 16-33433, 2017 WL 4990440, at *1 (Bankr. S.D. Tex. Oct. 27, 2017) (addressing the validity and priority of mechanic's and constitutional liens for work performed while constructing a building for the bankrupt debtor).

In this case, CJ filed Lien/Affidavit #1 and Lien/Affidavit #2 claiming a statutory lien on the Project in the real property records on September 15, 2020 and on October 14, 2020, respectively. CJ then filed an action against the property owner, BSPV, in August 2021 as well as a demand for arbitration pursuant to its subcontract with North/South. After BSPV filed for bankruptcy in March 2022, CJ filed a proof of claim for $1,282,519.15 in which it asserted that its claim was secured by its pre-petition mechanic's lien on BSPV's property. In this adversary proceeding, BSPV objects to the allowance of CJ's claim. BSPV specifically disputes the validity of the alleged debt.

## A. Claims Allowance

A proof of claim is a written statement setting forth a creditor's claim. FED. R. BANKR. P. 3001(a). The filing of "a proof of claim is analogous to the commencement of an action within the bankruptcy proceeding." *In re Ira Haupt & Co.*, 253 F. Supp. 97, 98–99 (S.D.N.Y.), *modified sub nom. Henry Ansbacher & Co. v. Klebanow*, 362 F.2d 569 (2nd Cir. 1966). "The filing of a proof of claim effectively commences a proceeding within the bankruptcy proceeding to establish its provability, priority, amount, etc." *Id.* A party that files a proof of claim in accordance with the Federal Rules of Bankruptcy Procedure is deemed to have established a prima facie case against the debtor's assets. FED. R. BANKR. P. 3001(f). *See also In re Fid. Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988).

A proof of claim must "be executed by the creditor or the creditor's authorized agent." FED. R. BANKR. P. 3001(b). A proof of claim that conforms substantially to the appropriate Official Form, and that is filed in accordance with Rule 3001, constitutes prima facie evidence of validity of the claim. FED. R. BANKR. P. 3001(f). Accordingly, a creditor's proof of claim is prima facie valid if the creditor completes all required portions of the Official Bankruptcy Proof of Claim Form (now labeled as Form 410), attaches all supporting documents available for that claim, and meets the requirements of any applicable subparagraph of Rule 3001. *See In re Harris*, 492 B.R. 225, 227–28 (Bankr. S.D. Tex. 2013) (discussing the required use of the Official Proof of Claim Form under Rule 3001, as well as the Form's requirements). Ultimately, a proof of claim must fulfill its "essential purpose of providing objecting parties with sufficient information to evaluate the nature of the claims." *In re Wyly*, 552 B.R. 338, 378 (Bankr. N.D. Tex. 2016).

Once a proof of claim is determined to have prima facie validity, the debtor may object to the claim to disprove its validity. To successfully object to a claim, a debtor must produce evidence rebutting the claim pursuant to 11 U.S.C. § 502(b). *In re Fid. Holding Co., Ltd.*, 837 F.2d at 698; *In re Depugh*, 409 B.R. 125, 135 (Bankr. S.D. Tex. 2009). Rebuttal evidence must be equal in probative value to successfully rebut a creditor's proof of claim. *In re Wyly*, 552 B.R. at 379. "This can be done by the objecting party producing specific and detailed allegations that place the claim into dispute, by the presentation of legal arguments based upon the contents of the claim and its supporting documents, or by the presentation of pretrial pleadings, such as a motion for summary judgment, in which evidence is presented to bring the validity of the claim into question." *In re Fid. Holding Co., Ltd.*, 837 F.2d at 698.

If the objecting party produces evidence equal in probative force to the creditor's claim, or the claimant fails to prove its claim's prima facie validity, the claimant must present additional evidence to "prove the validity of the claim by a preponderance of the evidence." *Id.*; *see also In re DePugh*, 409 B.R. 84, 97–98 (Bankr. S.D. Tex. 2009) ("If, however, an unsecured creditor files a proof of claim that fails to comply with Bankruptcy Rule 3001, the Debtor has no evidentiary burden to overcome when lodging a claim objection pursuant to § 502(b), at which point the burden shifts back to the claimant to prove the underlying validity of its claim by a preponderance of the evidence in order to have its claim allowed."). The ultimate burden of proof always rests upon the claimant. *In re Fid. Holding Co., Ltd.*, 837 F.2d at 698.

Here, CJ's Claim # 10 asserted a claim in the total amount of $1,282,519.15, secured by mechanic's liens recorded on BSPV's property on September 15, 2020, and October 14, 2020, for unpaid labor and materials, as well as alleged damages arising from construction delays, due under its subcontract with North/South. Claim # 10 conformed substantially to the appropriate

Official Form and was filed in accordance with Rule 3001. The Official Form 10 included Lien/Affidavit #1 and Lien/Affidavit #2. Because Claim # 10 meets the necessary requirements, and because Claim # 10 provided BSPV and other parties in interest with sufficient information to evaluate the claim, CJ met its burden of establishing a prima facie claim. The burden, therefore, shifted to BSPV to establish that CJ's Claim #10 should not be allowed.

At trial, the evidence introduced by the parties focused on three central disputes as to the validity of CJ's claim. First, whether CJ subcontracted to frame only 330,073 square feet. Second, whether CJ completely performed its subcontract and is owed the balance of $407,828.82 as well as $199,613.40 for additional framing. And third, whether CJ incurred damages in the amount of $231,363.51 as a proximate result of construction delays.

## 1. Framing Square Footage

As to the threshold dispute, CJ contends that it subcontracted with North/South to frame 330,073 square feet. CJ argues that the fact that its bid was one of the documents attached to the subcontract, and that the bid referenced the air-conditioned square footage of 330,073, shows the parties' intent that the subcontract would encompass only 330,073 square feet of framing. Alternatively, CJ argues that the Court should grant it equitable relief from the subcontract based on the doctrine of mistake (mutual or unilateral).

In their Joint Pretrial Order, the parties described the subcontract as an unambiguous, fixed-price contract. The language of the subcontract described the work to be performed as follows: "Complete framing of all buildings as shown on plans. Includes maintenance, clubhouse, and all garages. General contractor to provide all material."

CJ's reliance on its bid proposal to limit the scope of work to 330,073 square feet is misplaced. The plain language of the subcontract indicates that CJ's bid is an extraneous

document not in need of incorporation because the subcontract required the completion of framing of all buildings *as shown on the plans* -- not as set forth in CJ's bid. Texas courts strive not to read language in a contract to be redundant or superfluous. *See Philadelphia Indem. Ins. Co. v. White*, 490 S.W.3d 468, 477 (Tex. 2016). Moreover, CJ's actions reflect that it understood that it was not subcontracting to frame a particular number of square feet. CJ removed the price-per-square-foot language from its third bid, which was the bid North/South accepted.

Alternatively, in its closing brief, CJ argues that "both parties were mistaken in the belief that the framing work encompassed 330,073 square feet" and the "mistaken belief by both parties resulted in a mutual mistake of a key term to the contract which should, under Texas law, result in an equitable remedy for the party claiming mutual mistake." However, CJ's adversary complaint did not seek equitable relief from the framing subcontract based on mistake (unilateral or mutual). Nor did CJ seek such relief in response to North/South's counterclaim for breach of contract. Even if CJ had responded to North/South's counterclaim for breach of contract with an affirmative defense of mistake, CJ failed to carry its burden.

Under Texas law, mistake is an affirmative defense to the enforcement of a contract, and the party asserting the affirmative defense of mistake as the burden of proof. When parties to an agreement have contracted under a mutual misconception of material fact, the agreement is voidable under the doctrine of mutual mistake. *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990). To prove mutual mistake, a party must show that there exists: (1) a mistake of fact, (2) held mutually by the parties, (3) which materially affects the agreed upon exchange. *Wallerstein v. Spirt*, 8 S.W.3d 774, 781 (Tex. App.—Austin 1999, no pet.). *Wallerstein*, 8 S.W.3d at 781; *De Monet v. PERA*, 877 S.W.2d 352, 357 (Tex. App.—Dallas 1994, no writ).

Here, CJ did not establish any mistake by North/South. The only person who thought the framing square footage was 330,073 was Mr. Chukwura, who clung to this number despite being an architect and despite having full access to the architectural drawings. Any mistake by CJ in reading the architectural drawings prior to submitting a framing bid to North/South was unilateral. Further, Mr. Chukwura was alerted to his mistake when he received the bid from ReyTex, which described the square footage to be framed as 390,000 square feet, before executing the subcontract with North/South.

A unilateral mistake by a party to the agreement ordinarily will not constitute grounds for relief when the mistake was not known to or induced by the other party. *Cigna Ins. Co. of Texas v. Rubalcada*, 960 S.W.2d 408, 412 (Tex. App.—Houston [1st Dist.] 1998, no pet.) ("As a general rule, a mistake that justifies rescission must be a mutual, not a unilateral mistake"). Equitable relief may be granted for a unilateral mistake when (1) the mistake is of so great a consequence that to enforce the contract as made would be unconscionable; (2) the mistake relates to a material feature of the contract; (3) the mistake must have been made regardless of the exercise of ordinary care; and (4) the parties can be placed in status quo in the equity sense. *Cigna Ins. Co. of Texas v. Rubalcada,* 960 S.W.2d 408, 412 (Tex. App.—Houston [1st Dist.] 1998, no pet.). Each of these elements is a fact issue, and other circumstances, "such as the acts and extent of knowledge of the parties" is relevant. *James T. Taylor & Son, Inc. v. Arlington Indep. Sch. Dist.,* 335 S.W.2d 371, 373 (Tex. 1960).

In this case, even if CJ had properly raised the issue of a unilateral mistake prior to trial, CJ did not establish the required element of unconscionability. CJ's contract with ReyTex bound ReyTex to perform 100% of the framing labor for $1,700,000, which was $350,000 less than CJ's subcontract with North/South. Second, CJ cannot establish that it exercised ordinary care in

reviewing the architectural drawings. The drawings themselves differentiated between livable unit square footage and the gross area of each building. Mr. Chukwura simply misread the drawings and failed to check his work after receiving conflicting information from ReyTex about the square footage to be framed prior to executing the subcontract with North/South. Third, North/South provided CJ with access to the full architectural drawings prior to its bid, and North/South did not induce any error by Mr. Chukwura in reading the drawings. Indeed, ReyTex looked at the drawings it received from Mr. Chukwura and understood the square footage to be 390,000 square feet. Fourth, a rescission or reformation of the framing subcontract would prejudice North/South, as it had at least one other framing subcontractor that bid to perform the work for $2.1 million.

### 2. Damages for "Additional Framing"

CJ presented the expert testimony of Mr. Holstead to support a claim for damages for "additional framing" in the amount of $199,613.40. However, the Court found Mr. Holstead's testimony on framing damages to be unreliable because his underlying data and reasoning were flawed.

Mr. Holstead calculated damages based on the flawed assumption that CJ had subcontracted to provide 330,073 square feet of framing and anything above that amount of square footage was "additional framing." As discussed, CJ's subcontract with North/South clearly and unambiguously provided that CJ would frame all the buildings "as shown one the drawings," which was 417,000 square feet of framing. CJ's assertion North/South increased the framing square footage from 330,073 to 417,000 square feet was not credible nor supported by the documentary evidence.

In addition, when calculating the amount of square footage that CJ had framed prior to the termination of the framing subcontract, Mr. Holstead erred in relying on the percentage completion figure in a pay application from North/South to Huntington dated August 31, 2020. That pay application included a completion figure of 86.67% for both labor *and materials* related to framing. The percentage of completed framing *labor* was significantly less than 86.67%. As of July 31, 2020, CJ was reporting to North/South that its labor was 74% complete, and North/South was passing this figure to Huntington. (Even this figure was likely too high as the evidence at trial showed that CJ systemically exaggerated the percentage of framing it had completed.) Mr. Holstead's conclusion that CJ had completed 362,000 square feet out of the total 417,000 square feet of framing for the Project (*i.e.*, 86.67% of the total square feet) was unreliable.

CJ had not finished its scope of work under the subcontract at the time it stopped work on the Project. CJ did not perform any "additional framing" outside of its scope of work. Furthermore, CJ had not incurred any damages at the time it stopped work on framing the Project. To the contrary, CJ had made approximately $380,000 in net profit by August 26, 2020 – which is the difference between what it had received from North/South ($1,398,885) and what it had paid to ReyTex ($997,038). In contrast, if CJ had completed framing the Project, CJ's net profit would have been $350,000 – which is the difference between the amount it would have received from North/South ($2,050,000) and the amount it was obligated to pay ReyTex $1,700,000 for doing the actual work.

### 3.   Delay Damages

Mr. Holstead also testified that CJ had incurred what he described as "extended general conditions/salaries" in the amount of $231,362 as a result of construction delays. Under

construction law, "delay damages" refer to damages "arising out of delayed completion,
suspension, acceleration or disrupted performance," and these damages compensate the
contracting party that is injured when a project takes longer than the construction contract
specified. *Cnty. of Galveston v. Triple B Servs., LLP*, 498 S.W.3d 176, 181 (Tex. App. —
Houston [1st Dist.] 2016) (quoting Phillip J. Bruner & Patrick J. O'Connor, 5 Construction Law §
15:29 (2002)); *see Green Intern., Inc. v. Solis,* 951 S.W.2d 384, 393 (Tex. 1997) (referring to
delay damages as "a term of art in the construction industry referring to compensable damage
from a delay that could have been avoided by due care"). A plaintiff seeking money damages for
delay has the burden of proving that the delays actually caused the plaintiff's money damages.
*City of Beaumont v. Excavators & Constructors, Inc*., 870 S.W.2d 123, 131-32 (Tex. App.—
Beaumont 1993). "Broad generalities and inferences to the effect that defendants must have
caused some delay and damage because the contract took 318 days longer to complete than
anticipated are not sufficient." *Id*. at 132 (quoting *Wunderlich Contracting Co. v. United States*,
351 F.2d 956 (Ct. Cl. 1965)).

Here, CJ points to the length of time between when ReyTex began snapping chalk lines
in May 2019 and when CJ quit providing framing labor for the Project in August 2020. This is
more than the 180 days contemplated in the subcontract between CJ and North/South, which
ended in November 2019. In its closing, North/South did not dispute that the scope of work
began in May 2019. It argued, however, that CJ incurred no damages as a proximate result of
construction delay.

The primary element of the "delay damages" asserted by CJ was an alleged salary of
$227,159 for Mr. Chukwura, the sole owner, officer, and employee of CJ, from November 2019
through September 2020. This figure represented a full-time salary for Mr. Chukwura during that

period. However, CJ provided no evidence that Mr. Chukwura spent 100% of every business day from November 2019 to September 2020 working on the Project. Mr. Chukwura was not stationed at the Project and did not supervise the framing work. He was more of a broker between ReyTex and North/South than a framing manager for the Project. Moreover, as Mr. Courrier testified, Mr. Holstead's calculation of a salary for Mr. Chukwura as "delay damages" does not resemble the type of delay damages that are potentially available under Texas law.

The only evidence before the Court is that for a few days in May, July, and September 2019, workers for Reytex laid out chalk lines on the slabs, signifying where, in the future, plumbing and interior walls and windows would be installed. CJ presented no testimony that it incurred *any* direct costs while ReyTex was snapping chalk lines during this time period. More generally, throughout its work on framing the Project, CJ had virtually no costs for field work. CJ was not on site every day, did not do the framing work itself, and did not supervise the actual framing work. The only submitted "actual" costs was $21,838 in three months of equipment rental and minor miscellaneous charges for supplies, all incurred in the summer of 2020. However, CJ did not establish that this equipment was needed, or needed longer, due to any delay on the Project.[3]

In summary, the Court finds the rebuttal evidence presented by BSPV to be at least equal in probative value to that of CJ, as the evidence includes specific allegations that place CJ's Claim #10 into dispute. *In re Fid. Holding Co., Ltd.*, 837 F.2d at 698; *In re Wyly*, 552 B.R. at 379. Consequently, the ultimate burden of proof was upon CJ to show that its proof of claim is valid. *In re Fid. Holding Co., Ltd.*, 837 F.2d at 698 ("The ultimate burden of proof always rests upon the claimant."). CJ failed to carry its burden to prove the validity of Claim # 10 by a preponderance of the evidence.

---

[3] Notably, CJ never provided written notice to North/South of any "delay damages" prior October 2020.

### B. North/South's Breach of Contract Claim Against CJ

North/South asserts a counterclaim against CJ for breach of the framing subcontract. North/South seeks to recover its completion cost damages owing to CJ's repudiation of its obligation to complete the framing scope of work for the Project. CJ disputes whether it repudiated its obligations under the subcontract. CJ argues that Mr. Chukwura never stated that he was repudiating the framing subcontract and points out that he had to be forcibly removed from the jobsite.

Under Texas law "[a]nticipatory breach, also known as repudiation, is a positive and unconditional refusal to perform the contract in the future, expressed either before performance is due or after partial performance." *Edwards v. Atom Air Conditioning & Heating, Inc.*, No. 14-00-01473-CV, 2001 WL 1103659, at *2 (Tex. App.—Houston [14th Dist.] Sept. 20, 2001, no pet.) (mem. op.) (citation omitted). Repudiation is "evidenced by conduct that shows a fixed intention to abandon, renounce, and refuse to perform the contract." *Am. Midstream (Alabama Intrastate), LLC v. Rainbow Energy Mktg. Corp.*, 667 S.W.3d 837, 862 (Tex. App.—Houston [1st Dist.] 2023, pet. granted). In that vein, "[r]epudiation may be proven by words or actions." *See Hoeffner, Bilek & Eidman, L.L.P. v. Guerra,* No. 13-01-503-CV, 2004 WL 1171044, at *3 (Tex. App.—Corpus Christi–Edinburg May 27, 2004, pet. denied).

Here, Mr. Chukwura repeatedly represented to Mr. Zais and Mr. Shaw that CJ could not finish framing the Project for the subcontract price of $2,050,000. Mr. Chukwura stated unequivocally that CJ needed at least an additional $400,000 to finish framing the Project.[4] Mr. Chukwura repeatedly presented North/South with what he called "change orders," which North/South repeatedly rejected. By August 26, 2020, CJ was refusing to provide framing labor because CJ claimed it did not have the funds to pay ReyTex. CJ never provided framing labor for

---

[4] At trial, Mr. Chukwura stated that a rise in labor rates justified CJ's demand. However, CJ had a fixed price sub-subcontract with Reytex to complete the framing work.

the Project after August 26, 2020. ReyTex began working directly for North/South. However, Mr. Chukwura continued to communicate with North/South regarding CJ's demands, and he was forcibly removed from the jobsite in September 2020. CJ, through its clear and unequivocable words and actions, repudiated the framing subcontract.

Having demonstrated that a repudiation occurred, the topic of North/South's damages is a simple one. The parties stipulated that North/South's cost evidence was admissible and was incurred in the completion of the framing work scope. North/South's expert, Tanner Courrier, testified that North/South incurred an excess cost, over and above the $2,050,000 subcontract sum to complete the framing work. Based on Mr. Courrier's analysis of facts, market costs, and the original pricing for the work, Mr. Courrier concluded that this overrun, some $352,456, represented reasonable and necessary costs to have the CJ scope completed.

### B.  Fraudulent Liens

BSPV and North/South contend that Lien/Affidavit #1 and Lien/Affidavit #2 are fraudulent in multiple respects. They assert that CJ has no basis for its claim that North/South approved change orders, CJ performed extra work, or CJ suffered any delay damages. They seek statutory damages of $10,000 against CJ and its principal, Ike Chukwura, for each allegedly fraudulent lien.

The fraudulent-lien statute provides:

(a) A person may not make, present, or use a document or other record with:
(1) knowledge that the document or other record is a fraudulent court record or a fraudulent lien or claim against real or personal property or an interest in real or personal property;
(2) intent that the document or other record be given the same legal effect as a court record or document of a court created by or established under the constitution or laws of this state or the United States or another entity listed in Section 37.01, Penal Code, evidencing a valid lien or claim against real or personal property or an interest in real or personal property; and
(3) intent to cause another person to suffer:
(A) physical injury;

(B) financial injury; or

(C) mental anguish or emotional distress.

*See* Tex. Civ. Prac. & Rem. Code § 12.002(a). The party asserting that a claimed lien is a fraudulent lien has the burden to prove the requisite elements in the statute. *Aland v. Martin,* 271 S.W.3d 424, 430 (Tex. App. —Dallas 2008, no pet.). A party who satisfies the section 12.002(a) requirements may recover $10,000 or the actual damages caused by the violation, whichever is greater, in addition to court costs, attorney's fees, and exemplary damages. *See* Tex. Civ. Prac. & Rem. Code § 12.002(b).

Here, both Lien/Affidavit #1 and Lien/Affidavit #2 reference change orders. Mr. Chukwura knew when he signed the affidavits that North/South had not approved any change orders. In the parties' Joint Pre-Trial Order, the parties stipulated that North/South had not approved any change orders. Further, Mr. Chukwura testified at trial that North/South never executed a change order. Mr. Chukwura also testified that he had never memorialized in writing any alleged agreement with Roger Zais regarding the change orders.

Lien/Affidavit # 2 added $520,940 for "extended general conditions incurred from November 2019, thorough September 2020," to CJ's claim. Mr. Chukwura knew when he signed Lien/Affidavit #2 that CJ had not notified North/South of any delay damages until sending an email to Mr. Zais two days prior to filing the lien. Further, he failed to offer evidence explaining how he arrived at this figure at trial. CJ's claim for $520,000 for "extended general conditions" far exceeds his trial expert's calculations.

Lien/Affidavit #1 and Lien/Affidavit #2 were not simply factually inaccurate in some respect. *See Walker & Assocs. Surveying, Inc. v. Roberts,* 306 S.W.3d 839, 849 (Tex. App.—Texarkana 2010, no pet.) ("We see a distinction in an affidavit that is factually inaccurate in some respect and one that is attempting to perpetrate a fraud."). Lien/Affidavit #1 and Lien

**Page 30**

Affidavit #2 were false. CJ knew that North/South had not approved any change orders described in the affidavits, and that it had not timely notified North/South of any delay damages described in Lien/Affidavit #2, when it filed the liens. *Centurion Planning Corp., Inc. v. Seabrook Venture II*, 176 S.W.3d 498, 507 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (lien "fraudulent" when created by filer "knowing ... that the lien was invalid and intending that it be given the same legal effect as a valid lien").

Because CJ filed the liens pursuant to Chapter 53 of the Texas Property Code, North/South and BSPV also must show CJ acted with intent to defraud it. *See* Tex. Civ. Prac. & Rem. Code Ann. § 12.002(c). "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). "While there is rarely direct evidence of fraudulent intent, the fact finder is permitted to draw reasonable inferences from the direct and circumstantial evidence." *Zaragoza v. Jessen*, 511 S.W.3d 816, 823–24 (Tex. App.–El Paso 2016, no pet.); *see also Spoljaric*, 708 S.W.2d at 435 (noting intent "invariably must be proven by circumstantial evidence"). Intent may also be inferred from a party's subsequent actions. *Spoljaric*, 708 S.W.2d at 434.

Here, CJ and its principal, Mr. Chukwura, knew that Lien Affidavit #1 and Lien Affidavit #2 were "fraudulent," that is, created in bad faith or with dishonesty, a lack of integrity, or moral turpitude. *Nationstar Mortgage LLC v. Barefoot*, 654 S.W.3d 440, 445–47 (Tex. App.—Houston [14th Dist.] Oct. 28, 2021). CJ and its principal, Mr. Chukwura, knew that Lien/Affidavit #1 and Lien/Affidavit #2 were not merely incorrect. CJ and its principal, Mr. Chukwura, made knowingly false statements in the lien affidavits regarding change orders that never occurred and, as support, they attached pay applications that they knew were never approved by North/South.

This was done in order to cause a financial injury to BSPV and to force BSPV or North/South to agree to pay CJ more than the amount it was due under the framing subcontract.

The Court, therefore, concludes that the two liens filed by CJ were fraudulent and violated section 12.002(a) of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE § 12.002(a), (c). There was no reasonable basis for Mr. Chukwura to state in either lien affidavit that that there had been change orders to the subcontract which increased the subcontract price. This is especially true as to Lien #2 because at the time CJ recorded Lien #2, CJ was no longer a part of the Project, and the purported lien was based on delay damages rather than "labor" or "material" supplied for the Project.[5] The liens were filed in bad faith, or with dishonesty, or a lack of integrity, and thus were fraudulent. *See Barefoot*, 654 S.W.3d at 453.

## CONCLUSION

For all the foregoing reasons, it is

**ORDERED** that BSPV's objection to the allowance of CJ's Claim #10 is **SUSTAINED** and CJ's claim is **DISALLOWED** in its entirely; it is further

**ORDERED** that CJ and Ike Chukwura, jointly and severally, are liable to BSPV and North/South for $10,000 in statutory damages for Lien/Affidavit #1 and for $10,000 in statutory damages for Lien/Affidavit #2; it is further

**ORDERED** that North/South established that CJ repudiated and breached the framing subcontract and is liable to North/South for breach of contract damages in the amount of

---

[5] Mechanic's liens secure payment for, among other things, "labor used in the direct prosecution of the work" and/or 'material, machinery, fixtures, or tools used in the direct prosecution of the work." However, in this case, neither of the liens are based on labor or material used in the direct prosecution of CJ's work on the Project. *See* TEX. PROP. CODE § 53.001(3), (4). For purposes of mechanic's and materialman's liens, "labor" means labor used in the direct prosecution of the work. TEX. PROP. CODE § 53.001(3) "Work" means any part of construction or repair performed under an original contract. TEX. PROP. CODE § 53.001(14).

$352,456 in costs for completing the framing scope of work in excess of the fixed subcontract price of $2,050,000; it is further

**ORDERED** that North/South and BSPV may file an application for their attorney's fees within thirty (30) days of the entry of this memorandum opinion and order, and CJ shall have fourteen (14) days to object to any such application(s).

Signed on 03/31/2025

*Brenda T. Rhoades*      SD

HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE